# **<u>EXHIBIT A</u>**



# SUBSCRIPTION AGREEMENT

The following document is the subscription agreement compiled by Jesup & Lamont in accordance with the terms of this current financing.

This agreement is for you review and the following pages should be filled out and signed:

*Purchaser Signature Pages to JLI Subscription Agreement:*      Page 10

*Exhibit B: Investor Questionnaire:*      Page 19

## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "Agreement"), dated August __, 2008, by and among JESUP & LAMONT, INC., a Florida corporation (the "Company"), and the several subscribers signatory hereto (each such subscriber, a "Subscriber" and, collectively, the "Subscribers").

**WHEREAS,** the Company and the Subscribers are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), 4(6) and Rule 506 of Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act"); and

**WHEREAS,** the parties desire that, upon the terms and subject to the conditions contained herein, the Company shall issue and sell to the Subscribers, as provided herein, and the Subscribers, severally and not jointly, shall purchase, an aggregate amount of up to $5,000,000.00 (the "Purchase Price") comprised of (i) the Company's Common Stock, par value $0.01 per share ("Common Stock) at a price of $____ per share, and (ii) warrants, in the ratio of one Warrant for each four shares of Common Stock purchased, at a price of $0.125 per Warrant. Each Warrant shall be in the form attached hereto as Exhibit A (a "Warrant"), and shall be exercisable to purchase one share of the Common Stock, at a price of $____ per share. The shares underlying the Warrants are referred to as the Warrant Shares. The aggregate Purchase Price for the Shares and Warrants shall be payable to the Company on the Closing Date, as defined in Section 10(b) hereof. The shares of Common Stock issuable to the Subscribers are referred to herein as the "Shares". The Shares, the Warrant Shares and the Warrants are collectively referred to herein as the "Securities".

**NOW, THEREFORE,** in consideration of the mutual covenants and other agreements contained in this Agreement the Company and each Subscriber hereby agree as follows:

1.  _Purchase and Sale of Shares and Warrants._ Subject to the satisfaction (or waiver) of the conditions to Closing set forth in this Agreement, each Subscriber shall purchase Shares for the Subscription Amount indicated on the signature page hereto, and the Company shall sell the Shares called for by the Subscription Amount to each Subscriber. In addition, each Subscriber shall purchase one Warrant for each four Shares purchased, at a price of $0.125 per Warrant, and the Company shall sell such Warrants to each Subscriber. The total Purchase Price for the Shares and Warrants shall be paid in cash. On or before the Closing Date, each Subscriber shall deliver its portion of the Purchase Price by wire transfer to an account designated by the Company. The Company shall deliver to each Subscriber: (i) certificates for the number of Shares purchased hereunder by each Subscriber, and (ii) Warrants for the number of Warrants purchased hereunder by each Subscriber. Each Subscriber understands that the Shares and the Warrant Shares will not be issued until they have been approved for listing by the American Stock Exchange. The Company will not issue fractional Shares or Warrants but will refund amounts in excess of the price of the nearest full number of Shares and Warrants that can be purchased with the purchase price tendered hereunder. The Closing will occur after the Company has received subscriptions for the Purchase Price.

2.     Warrants.  Each Warrant shall be exercisable to purchase one share of Common Stock at a price of $_____ per share.  The Warrants shall be exercisable, beginning six months after the date of issue, until five years from warrant issue date.

3.     Subscriber's Representations and Warranties.  Each Subscriber hereby represents and warrants to and agrees with the Company that:

(a)     Information on Company.  The Subscriber has been furnished with or has had access at the EDGAR Website of the SEC to the Company's Form 10-KSB/A, filed on April 29, 2008, for the year ended December 31, 2007 and the Company's Form 10-KSB for the year ended December 31, 2006 as filed with the SEC, together with all subsequently filed Forms 10-Q, Forms 10-QSB, 8-K, and filings made with the SEC available at the EDGAR website (any such document, an "SEC Document"). The Subscriber has reviewed the risk factors attached hereto as Exhibit C.  Other than general economic conditions, events or circumstances that may affect the industry in general, the Company has no knowledge that any of the events or circumstances described in Exhibit C have occurred or are likely to occur.  The Subscriber has considered all factors the Subscriber deems material in deciding on the advisability of investing in the Securities.

(b)     Information on Subscriber.  At the time the Subscriber was offered the Securities it was, and as of the date hereof it is an "accredited investor", as such term is defined in Regulation D promulgated by the SEC under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable the Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase, which represents a speculative investment.  The Subscriber has the authority to purchase and own the Securities, is able to bear the economic risk of such investment and, at the present time, is able to afford a complete loss thereof.  Further, the information set forth on the signature page hereto regarding the Subscriber is accurate.  The Subscriber has completed and returned to the Company the Investor Questionnaire Certification attached hereto as Exhibit B.

(c)     Purchase of Common Stock.  The Subscriber is purchasing the Securities as principal for its own account and not with a view to any distribution thereof (this representation and warranty not limiting such Subscriber's right to sell the Securities in compliance with applicable federal and state securities laws).

(d)     Compliance with 1933 Act.  The Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration.

(e)     Correctness of Representations.  The Subscriber represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects

2

and, unless the Subscriber otherwise notifies the Company prior to the Closing Date (as hereinafter defined), shall be true and correct in all material respects as of the Closing Date.

    4.    <u>Company Representations and Warranties</u>. The Company represents and warrants to each Subscriber that:

    (a)    <u>Corporate Existence and Qualification</u>. The Company and each of its subsidiaries is a corporation or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of their respective incorporation, formation or organization; has the corporate or other power to own, manage, lease and hold its properties and to carry on its business as and where such properties are presently located and such business is presently conducted; and is duly qualified to do business and is in good standing as a foreign corporation in each of the jurisdictions where the character of its properties or the nature of its business requires it to be so qualified.

    (b)    <u>Authority, Approval and Enforceability</u>. This Agreement has been duly executed and delivered by the Company, and the Company has all requisite corporate power and legal capacity to execute and deliver this Agreement and all agreements, instruments and documents executed and delivered or to be executed and delivered by the Company in connection with the transactions provided for hereby, to consummate the transactions contemplated hereby (collectively, the "Collateral Agreements"), and to perform its obligations hereunder and under this Agreement and each of the Collateral Agreements. The execution and delivery of this Agreement and the Collateral Agreements and the performance of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all corporate action necessary on behalf of the Company. This Agreement and each Collateral Agreement to which the Company is a party constitutes, or upon execution and delivery will constitute, the legal, valid and binding obligation of the Company, enforceable in accordance with its terms, except as such enforcement may be limited by general equitable principles or by applicable bankruptcy, insolvency, moratorium, or similar laws and judicial decisions from time to time in effect which affect creditors' rights generally.

    (c)    <u>Issuance of Securities</u>. The Company has full power and authority to issue the Securities, and upon receipt and acceptance of consideration from the Subscriber, the Shares and the Warrants will be legally and validly issued. The Company has taken all action required by its Articles of Incorporation and Bylaws and the rules and regulations of the American Stock Exchange to approve the offer and sale of the securities.

    (d)    <u>SEC Filings</u>. The Company's Form 10-KSB/A for the year ended December 31, 2007, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended and the information contained in the Form 10-KSB/A fairly presents, in all material respects, the financial condition and results of operations of the Company and does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

    (e)    <u>Capitalization; Ownership of Shares</u>. The authorized capital stock of the Company consists of 1,000,000 authorized shares of preferred stock, $0.01 par value per share, of which the following are issued and outstanding as of the date hereof: 0 shares of Series A, 0

shares of Series B, 7,062 shares of Series C, 0 shares of Series D, 0 shares of Series E, 819,987 shares of Series F and 1,688 shares of Series G; and 100,000,000 authorized shares of common stock, $0.01 par value per share, of which 20,827,148 are issued and 20,303,030 are outstanding as of the date hereof. An additional 2,682,976 shares of common stock have been subscribed but not yet issued.

(f)    Litigation. Except as disclosed in any SEC Document or on Schedule 4(f) hereto, there are no claims, actions, suits, investigations or proceedings against the Company or any of its subsidiaries pending or, to the knowledge of the Company, threatened in any court or before or by any governmental authority, or before any arbitrator, that might have a material adverse effect on the Company's business, operations, prospects, properties, or financial condition (whether covered by insurance or not) and there is no reasonable basis for any such claim, action, suit, investigation or proceeding.

(g)    Liabilities and Losses. Except as disclosed in any SEC Document, there are no outstanding liabilities of the Company other than in the ordinary course of business.

5.    Regulation D Offering. The offer and issuance of the Securities to the Subscriber is being made pursuant to the exemptions from the registration provisions of the 1933 Act afforded by Section 4(2) and 4(6) of the 1933 Act and Rule 506 of Regulation D promulgated there under.

6.    Transfer, Listing and Registration.

(a)    Transfers. The Securities may only be disposed of in compliance with state and federal securities laws. In connection with any transfer of Securities other than pursuant to an effective registration statement, to the Company, or to an Affiliate (as defined in Rule 144 under the 1933 Act) of a Subscriber, or by will or by the laws of descent or distribution, the Company may require the transferor thereof to provide to the Company an opinion of counsel selected by the transferor, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the 1933 Act. As a condition of transfer, any transferee shall agree in writing to be subject to the obligations of a Subscriber to this Agreement.

(b)    Legends. Each Subscriber and agrees to the imprinting, so long as is required by this Section 6, of a legend on the Shares and the Warrant Shares in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION

STATEMENT UNDER THE ACT AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS."

In addition, each Subscriber agrees to the imprinting, so long as is required by this Section 6, of a legend on the Warrants, in substantially the following form:

"NEITHER THIS WARRANT NOR THE COMMON STOCK WHICH MAY BE ACQUIRED UPON THE EXERCISE HEREOF, AS OF THE DATE OF ISSUANCE HEREOF, HAS BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAW, OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS."

(c)    Certificates.  The Company agrees to reissue certificates evidencing the Securities without the legend set forth in Section 6(b) if at such time, prior to making any transfer of any such Securities, such holder thereof shall give written notice to the Company describing the manner and terms of such transfer and removal as the Company may reasonably request.  Such transfer and removal will only be effected, (i) while a registration statement covering the resale of such security is effective under the 1933 Act, or (ii) following any resale of such Securities pursuant to Rule 144, or (iii) if such Securities are eligible for resale under Rule 144, or (iv) if such legend is not required under applicable requirements of the 1933 Act (including judicial interpretations and pronouncements issued by the Staff of the SEC).

(e)    Acknowledgement.  Each Subscriber agrees that the removal of the restrictive legend from certificates representing Securities as set forth in this Section 6 is predicated upon the Company's reliance that the Subscriber will sell any Securities pursuant to either the registration requirements of the 1933 Act, including any applicable prospectus delivery requirements, or an exemption there from.

(f)    Listing.  The Company covenants and agrees with each Subscriber that it will file an application with the American Stock Exchange to list the Shares and the Warrant Shares in the time and manner required by the rules of the American Stock Exchange, and will use its best efforts to prosecute such application to effectiveness.

(g)    Registration. The Company hereby grants to each Subscriber the right to demand registration on Form S-3 with respect to that Subscriber's Shares and Warrant Shares (the "Registrable Securities"); provided, however, that if the SEC declares effective any registration statement that includes Registrable Securities (a "Registration Statement"), subject to the withdrawal of certain Registrable Securities from the Registration Statement, and the reason is the SEC's determination that (x) the offering of any of the Registrable Securities constitutes a primary offering of securities by the Company, (y) Rule 415 may not be relied upon for the registration of any or all of the Registrable Securities, and/or (z) a holder of any Registrable Securities must be named as an underwriter, the Subscribers understand and agree that the Company may reduce, on a pro rata basis, the total number of Registrable Securities to be registered on behalf of each such Subscriber, until such time as: (i) all Registrable Securities held by such Subscriber have been registered pursuant to an effective Registration Statement, (ii) the Registrable Securities held by such Subscriber may be resold without restriction pursuant to Rule 144 of the Act, or (iii) the Subscriber agrees to be named as an underwriter in any such Registration Statement. The Subscribers acknowledge and agree the provisions of this paragraph may apply to more than one Registration Statement.

7.    Conditions Precedent to Obligations of the Company. The obligations of the Company are subject to the fulfillment prior to or on the Closing Date of the following conditions any of which may be waived by the Company in writing:

(a)    all representations and warranties of the Subscriber contained in this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though such representations and warranties had been made on or as of such date; and

(b)    all agreements and covenants of the Subscriber to be performed or complied with on or prior to the Closing Date have in all material respects been so performed or complied with.

(c)    the Company shall have received subscriptions for the Purchase Price.

8.    Conditions Precedent to Obligations of the Subscriber. The obligations of the Subscriber are subject to the fulfillment prior to or on the Closing Date of the following conditions any of which may be waived by the Subscriber in writing:

(a)    all representations and warranties of the Company contained in this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though such representations and warranties had been made on or as of such date;

(b)    all obligations, agreements and covenants of the Company to be performed or complied with on or prior to the Closing Date shall have, in all respects been so performed or complied with; and

(c)    the Company shall have received subscriptions for the Purchase Price.

9.    Indemnity. The Company shall indemnify and hold harmless each Subscriber, and their respective directors, officers, shareholders, members, managers, and heirs and assigns

from and against any and all damages, liabilities, obligations, penalties, fines, judgments, claims, deficiencies, losses, costs, expenses (including, without limitation, reasonable attorneys' fees) and assessments arising out of, resulting from, or in any way related to a breach of, or the failure to perform or satisfy any of, the representations, warranties, covenants and agreements made by the Company in this Agreement or in any Collateral Agreement delivered by the Company pursuant hereto.

      10.    <u>Miscellaneous</u>.

      (a)    Notices.   All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.   The addresses for such communications shall be: (i) if to the Company, to:  Jesup & Lamont, Inc., 2170 West State Road 434, Suite 100, Longwood, Florida 32779, Attention: Chief Financial Officer, telecopier: (407) 551-4886, with a copy to:  Morse, Zelnick, Rose & Lander, LLP, 405 Park Avenue, Suite 1401, New York, New York 10022, Attention: Stephen Zelnick, telecopier:  (212) 838-9190, (ii) if to the Subscriber to: the address and telecopier number indicated on the signature pages hereto.

      (b)    <u>Closing</u>.   The consummation of the transactions contemplated herein (the "Closing") shall take place at the offices of Morse, Zelnick, Rose & Lander, New York, New York, upon receipt of good funds at the account designated by the Company ("Closing Date").

      (c)    <u>Entire Agreement; Assignment</u>.   This Agreement and the other Transaction Documents represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by the Company and the Subscriber.   Neither the Company nor the Subscriber has relied on any representations not contained or referred to in this Agreement and the documents delivered herewith.   No right or obligation of the Company shall be assigned without prior notice to and the written consent of the Subscriber.   The Subscriber may assign any or all of its rights hereunder to any person in connection with a transfer of any Security to such person, provided such transferee agrees in writing to be bound, with respect to the transferred Securities, by the provisions hereof that apply to the Subscriber.

      (d)    <u>Counterparts/Execution</u>.   This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the

same instrument.  This Agreement may be executed by facsimile signature and delivered by facsimile transmission.

(e)    Law Governing this Agreement.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state of New York. **The parties and the individuals executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the jurisdiction of such courts and waive trial by jury.**  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.   In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.

(f)    Equitable Adjustment.   The Securities and the purchase prices of Securities being purchased hereunder shall be equitably adjusted to offset the effect of stock splits, stock dividends, and distributions of property or equity interests of the Company to its shareholders occurring between the date of this Agreement and the Closing Date.

*(Signature Pages Follow)*

**IN WITNESS WHEREOF**, the parties hereto have caused this Subscription Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

**JESUP & LAMONT, INC.**                    Address for Notice:

By:_____    **2170 West State Road 434**
    Name:                              **Suite 100**
    Title:                             **Longwood, Florida 32779**
                          **Facsimile: (407) 551-4886**
                          **Attention: Chief Financial Officer**

With a copy to (which shall not constitute notice):
Morse, Zelnick, Rose & Lander, LLP
405 Park Avenue, Suite 1401,
New York, New York 10022
Attention: Stephen Zelnick
Facsimile: (212) 838-9190

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOR PURCHASER FOLLOWS]**

PURCHASER SIGNATURE PAGES TO JLI SUBSCRIPTION AGREEMENT

IN WITNESS WHEREOF, the undersigned have caused this Subscription Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Name of Purchaser: **Antoine Aysseh** _____

Signature of Authorized Signatory of Purchaser: _____

Name of Authorized Signatory: _____

Title of Authorized Signatory: __ _____

Email Address of Purchaser: ___ **kevin@khkiplinger.com** _____

Facsimile Number of Purchaser: _____ **203.202.2830** _____

Address for Notice of Purchaser:

> **250 East 54th Street**
> **Apt #34B**
> **New York, NY 10022-4816**

Address for Delivery of Securities for Purchaser (if not same as address for notice):

> **Jesup & Lamont Account #1245-1614**

Subscription Amount: $__ **125,000** ___

EIN Number: [PROVIDE THIS UNDER SEPARATE COVER]

## EXHIBIT A (WARRANT)

NEITHER THIS WARRANT NOR THE COMMON STOCK WHICH MAY BE ACQUIRED UPON THE EXERCISE HEREOF ("WARRANT SHARES"), AS OF THE DATE OF ISSUANCE HEREOF, HAS BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED, ASSIGNED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAW, OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

No. W-[number]

For the Purchase of [   ]
shares of Common Stock

## WARRANT FOR THE PURCHASE OF
## SHARES OF COMMON STOCK
## OF JESUP & LAMONT, INC.
### (A Florida corporation)

Jesup & Lamont, Inc., a Florida corporation (the "Company"), hereby certifies that for value received:
**[investor name and address]**

or registered assigns ("Registered Holder"), is entitled, subject to the terms set forth below, to purchase from the Company, at any time or from time to time during the period commencing on [date six months after warrant issue date], and ending at 5:00 p.m. on [date five years after warrant issue date], (the "Expiration Date"), [number of shares] fully paid and non assessable shares of Common Stock (subject to adjustment as provided herein), $0.01 par value, of the Company ("Common Stock"), at a per share purchase price of $_____. The number of shares of Common Stock purchasable upon exercise of this Warrant, and the purchase price per share, each as adjusted from time to time pursuant to the provisions of this Warrant, are hereinafter referred to as the "Warrant Shares" and the "Purchase Price", respectively.

1.   Exercise of Warrants.   The Registered Holder of any Warrant Certificate may exercise the Warrants, in whole or in part, starting on [date six months after warrant issue date], at any time or from time to time at or prior to the close of business, on the Expiration Date, at which time the Warrant Certificates shall be and become wholly void and of no value.  Warrants may be exercised by their holders as follows:

(a)   This Warrant may be exercised by Registered Holder, in whole or in part, by the surrender of this Warrant (with the Notice of Exercise Form attached hereto as Exhibit I duly executed by Registered Holder) at the principal office of the Company, or at such other office or agency as the Company may designate, accompanied by payment in full of an amount equal to the

then applicable Purchase Price multiplied by the number of Warrant Shares then being purchased upon such exercise.

(b)     Payment may be made either in lawful money of the United States or by surrender of an outstanding note made by the Company and payable to the Registered Holder with a balance of principal plus accrued and unpaid interest to the date of surrender equal to the payment required. Each exercise of this Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which this Warrant shall have been surrendered to the Company as provided in subsection 1 (a) above. At such time, the person or persons in whose name or names any certificates for Warrant Shares shall be issuable upon such exercise as provided in subsection 1 (c) below shall be deemed to have become the holder or holders of record of the Warrant Shares represented by such certificates.

(c)     As soon as practicable after the exercise of the purchase right represented by this Warrant, but in no case later than 5 business days after the Notice of Exercise is delivered to the Company, the Company at its expense will use its best efforts to cause to be issued in the name of, and delivered to, Registered Holder, or, subject to the terms and conditions hereof, to such other individual or entity as Registered Holder (upon payment by Registered Holder of any applicable transfer taxes) may direct:

(i)     a certificate or certificates for the number of full shares of Warrant Shares to which Registered Holder shall be entitled upon such exercise plus, in lieu of any fractional share to which Registered Holder would otherwise be entitled, cash in an amount determined pursuant to Section 3 hereof; and

(ii)     in case such exercise is in part only, a new warrant or warrants (dated the date hereof) of like tenor, stating on the face or faces thereof the number of shares currently stated on the face of this Warrant (subject to adjustment as provided herein) minus the number of such shares purchased by Registered Holder upon such exercise as provided in subsection 1(a) above.

(d)     In case the registered holder of any Warrant certificate shall exercise fewer than all of the Warrants evidenced by such certificate, the Company shall promptly countersign and deliver to the registered holder of such certificate, or to his duly authorized assigns, a new certificate evidencing the number of Warrants that were not so exercised.

(e)     Each person in whose name any certificate for securities is issued upon the exercise of Warrants shall for all purposes be deemed to have become the holder of record of the securities represented thereby as of, and such certificate shall be dated, the date upon which the Warrant certificate was duly surrendered in proper form and payment of the Purchase Price (and of any applicable taxes or other governmental charges) was made; provided, however, that if the date of such surrender and payment is a date on which the stock transfer books of the Company are closed, such person shall be deemed to have become the record holder of such shares as of, and the certificate for such shares shall be dated, the next succeeding business day on which the stock transfer books of the Company are open (whether before, on or after the Expiration Date) and the Company shall be under no duty to deliver the certificate for such shares until such date. The Company covenants and agrees that it shall not cause its stock transfer books to be closed for

a period of more than 10 consecutive business days except upon consolidation, merger, sale of all or substantially all of its assets, dissolution or liquidation or as otherwise provided by law.  The Company shall pay all documentary, stamp or other transactional taxes attributable to the issuance or delivery of shares upon exercise of the Warrants.

2.    Adjustments.

(a)    Split, Subdivision or Combination of Shares.  If the outstanding shares of the Company's Common Stock at any time while this Warrant remains outstanding and unexpired shall be subdivided or split into a greater number of shares, or a dividend in Common Stock shall be paid in respect of Common Stock, the Purchase Price in effect immediately prior to such subdivision or at the record date of such dividend, simultaneously with the effectiveness of such subdivision or split or immediately after the record date of such dividend (as the case may be), shall be proportionately decreased. If the outstanding shares of Common Stock shall be combined or reverse-split into a smaller number of shares, the Purchase Price in effect immediately prior to such combination or reverse split, simultaneously with the effectiveness of such combination or reverse split, shall be proportionately increased. When any adjustment is required to be made in the Purchase Price, the number of shares of Warrant Shares purchasable upon the exercise of this Warrant shall be changed to the number determined by dividing (i) an amount equal to the number of shares issuable upon the exercise of this Warrant immediately prior to such adjustment, multiplied by the Purchase Price in effect immediately prior to such adjustment, by (ii) the Purchase Price in effect immediately after such adjustment.

(b)    Reclassification, Reorganization, Consolidation or Merger.  In the case of any reclassification of the Common Stock (other than a change in par value or a subdivision or combination as provided for in subsection 2(a) above), or any reorganization, consolidation or merger of the Company with or into another corporation (other than a merger or reorganization with respect to which the Company is the continuing corporation and which does not result in any reclassification of the Common Stock), or a transfer of all or substantially all of the assets of the Company, or the payment of a liquidating distribution (each a "Fundamental Event") then, as part of any such reorganization, reclassification, consolidation, merger, sale or liquidating distribution, lawful provision shall be made so that Registered Holder shall have the right thereafter to receive upon the exercise hereof, the kind and amount of shares of stock or other securities or property which Registered Holder would have been entitled to receive if, immediately prior to any such reorganization, reclassification, consolidation, merger, sale or liquidating distribution, as the case may be, Registered Holder had held the number of shares of Common Stock which were then purchasable upon the exercise of this Warrant. In any such case, appropriate adjustment (as reasonably determined by the Board of Directors of the Company) shall be made in the application of the provisions set forth herein with respect to the rights and interests thereafter of Registered Holder such that the provisions set forth in this Section 2 (including provisions with respect to the Purchase Price) shall thereafter be applicable, as nearly as is reasonably practicable, in relation to any shares of stock or other securities or property thereafter deliverable upon the exercise of this Warrant.  The Company shall give the Registered Holder notice of any Fundamental Event at least 30 days prior to the closing or consummation of any Fundamental Event.

(c)    Price Adjustment.  No adjustment in the Purchase Price shall be required unless such adjustment would require an increase or decrease in the Purchase Price of at least $0.01,

provided, however, that any adjustments which by reason of this paragraph are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Section 2 shall be made to the nearest cent or to the nearest 1/100th of a share, as the case may be.

(d)   Price Reduction.  Notwithstanding any other provision set forth in this Warrant, at any time and from time to time during the period that this Warrant is exercisable, the Company in its sole discretion may reduce the Purchase Price or extend the period during which this Warrant is exercisable.

(e)   No Impairment.  The Company will not, by amendment of its Articles of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company but will at all times in good faith assist in the carrying out of all the provisions of this Section 2 and in the taking of all such actions as may be necessary or appropriate in order to protect against impairment of the rights of Registered Holder to adjustments in the Purchase Price.

(f)   Notice of Adjustment.  Immediately, upon any adjustment of the Purchase Price, number of shares the Warrants are exercisable for, or extension of the Warrant exercise period, the Company shall forthwith give written notice thereto to Registered Holder describing the event requiring the adjustment, stating the adjusted Purchase Price and the adjusted number of shares purchasable upon the exercise hereof resulting from such event, and setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

3.   Fractional Shares.  The Company shall not be required upon the exercise of this Warrant to issue any fractional shares, but shall make an adjustment thereof in cash on the basis of the last sale price of the Warrant Shares on the over-the-counter market as reported by the American Stock Exchange or on a national securities exchange on the trading day immediately prior to the date of exercise, whichever is applicable, or if neither is applicable, then on the basis of the then fair market value of the Warrant Shares as shall be reasonably determined by the Board of Directors of the Company.

(a)   Limitation on Sales.  The Warrant and the Warrant Shares may only be disposed of in compliance with state and federal securities laws.  In connection with any transfer of the Warrant or the Warrant Shares other than pursuant to an effective registration statement, the Company may require the Registered Holder to provide to the Company an opinion of counsel selected by the Registered Holder, the form and substance of which opinion shall be reasonably satisfactory to the Company, to the effect that such transfer does not require registration of such transferred Securities under the 1933 Act.

4.   The Warrant Shares issued upon exercise thereof shall be imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED, ASSIGNED OR OTHERWISE DISPOSED

OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS."

5.   Notices of Record Date. In case:

(a)   the Company shall take a record of the holders of its Common Stock (or other stock or securities at the time deliverable upon the exercise of this Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of any class or any other securities, or to receive any other right, or

(b)   of any capital reorganization of the Company, any reclassification of the capital stock of the Company, any consolidation or merger of the Company with or into another corporation (other than a consolidation or merger in which the Company is the surviving entity), or any transfer of all or substantially all of the assets of the Company, or

(c)   of the voluntary or involuntary dissolution, liquidation or winding-up of the Company;

then, and in each such case, the Company will mail or cause to be mailed to Registered Holder a notice specifying, as the case may be, (i) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is to take place, and the time, if any is to be fixed, as of which the holders of record of Common Stock (or such other stock or securities at the time deliverable upon the exercise of this Warrant) shall be entitled to exchange their shares of Common Stock (or such other stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up. Such notice shall be mailed at least twenty (20) days prior to the record date or effective date for the event specified in such notice, provided that the failure to mail such notice shall not affect the legality or validity of any such action.

6.   Reservation of Stock. The Company will at all times reserve and keep available, solely for issuance and delivery upon the exercise of this Warrant, such shares of Common Stock and other stock, securities and property, as from time to time shall be issuable upon the exercise of this Warrant. The Company shall apply for listing, and obtain such listing, for the Warrant Shares on the American Stock Exchange, at the earliest time that such listing may be obtained in accordance with the rules and regulations of the American Stock Exchange. All shares that may be issued upon exercise of this Warrant shall, at the time of issuance, be duly authorized, fully paid and non-assessable.

7.   Replacement of Warrants. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) upon delivery of an indemnity agreement (with surety if reasonably required) in an amount reasonably satisfactory to the Company, or (in the case of mutilation) upon surrender and cancellation of this Warrant, the Company will issue, in lieu thereof, a new Warrant of like

tenor. This Warrant is exchangeable for new Warrants (containing the same terms as this Warrant) each representing the right to purchase such number of shares as shall be designated by the Registered Holder at the time of surrender (but not exceeding in the aggregate the remaining number of shares of Common Stock which may be purchased hereunder.

8.    Transfers, etc.

(a)    The Company will maintain a register containing the names and addresses of Registered Holders. A Registered Holder may change his, her or its address as shown on the warrant register by written notice to the Company requesting such change.

(b)    Until any transfer of this Warrant is made in the warrant register, the Company may treat Registered Holder as the absolute owner hereof for all purposes, provided, however, that if and when this Warrant is properly assigned in blank, the Company may (but shall not be obligated to) treat the bearer hereof as the absolute owner hereof for all purposes, notwithstanding any notice to the contrary.

9.    No Rights as Stockholder. Until the exercise of this Warrant, Registered Holder shall not have or exercise any rights by virtue hereof as a stockholder of the Company.

10.    Successors. The rights and obligations of the parties to this Warrant will inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors, assigns, pledgees, transferees and purchasers. Without limiting the foregoing, the registration rights set forth in this Warrant shall inure to the benefit of Registered Holder and Registered Holder's successors, heirs, pledgees, assignees, transferees and purchasers of this Warrant and the Warrant Shares.

11.    Change or Waiver. Any term of this Warrant may be changed or waived only by an instrument in writing signed by the party against which enforcement of the change or waiver is sought.

12.    Headings. The headings in this Warrant are for purposes of reference only and shall not limit or otherwise affect the meaning of any provision of this Warrant.

13.    Governing Law. This Warrant shall be governed by and construed in accordance with the laws of the State of New York as such laws are applied to contracts made and to be fully performed entirely within that state between residents of that state.

14.    Jurisdiction and Venue. The Company and Registered Holder (i) agree that any legal suit, action or proceeding arising out of or relating to this Warrant shall be instituted exclusively in New York State Supreme Court, County of New York or in the United States District Court for the Southern District of New York, (ii) waives any objection to the venue of any such suit, action or proceeding and the right to assert that such forum is not a convenient forum for such suit, action or proceeding, and (iii) irrevocably consent to the jurisdiction of the New York State Supreme Court, County of New York, and the United States District Court for the Southern District of New York in any such suit, action or proceeding, and the Company and Registered Holder further agree to accept and acknowledge service or any and all process which may be served in any such suit, action or proceeding in New York State Supreme Court, County

of New York or in the United States District Court for the Southern District of New York and agrees that service of process upon it mailed by certified mail to its address shall be deemed in every respect effective service of process upon it in any suit, action or proceeding.

15.    Mailing of Notices, etc.  All notices and other communications under this Warrant (except payment) shall be in writing and shall be sufficiently given if delivered to the addressees in person, by Federal Express or similar receipt delivery, by facsimile delivery or, if mailed, postage prepaid, by certified mail, return receipt requested, as follows:

to Registered Holder:          [insert contact details for holder]

to the Company:                Jesup & Lamont, Inc.
                               2170 West State Road 434
                               Suite 100
                               Longwood, Florida 32779
                               Attention: Chief Financial Officer
                               Fax: (407) 551-4886


with a copy to:                Morse, Zelnick, Rose & Lander LLP
                               405 Park Avenue
                               New York, New York 10022
                               Attention: Stephen Zelnick, Esq.
                               Fax: (212) 838-9190


or to such other address as any of them, by notice to the other may designate from time to time. Time shall be counted to, or from, as the case may be, the delivery in person or by mailing.

Dated: [insert date]

                               JESUP & LAMONT, INC.

                               By:_____
                                       [NAME]
                                       [TITLE]

EXHIBIT I

NOTICE OF EXERCISE

TO:    Jesup & Lamont, Inc.
       2170 West State Road 434
       Suite 100
       Longwood, Florida 32779
       Attention: Chief Financial Officer

1.    The undersigned hereby elects to purchase _____ shares of the Common Stock of Jesup & Lamont, Inc., pursuant to terms of the attached Warrant, and tenders herewith payment of the purchase price of such shares in full, together with all applicable transfer taxes, if any.

2.    Please issue a certificate or certificates representing said shares of the Common Stock in the name of the undersigned or in such other name as is specified below. If the attached Warrant is exercisable for a greater number of shares than the number set forth in paragraph 1, then please issue another Warrant in the name of the undersigned or in such other name as is specified below exercisable for the remaining number of shares.

3.    The undersigned represents that it will sell the shares of Common Stock pursuant to an effective Registration Statement under the Securities Act of 1933, as amended, or an exemption from registration there under.


                                             (Name)


       (Address)
       (Taxpayer Identification Number)
[print name of Registered Holder]
By:
Title:
Date:

**(INVESTOR QUESTIONNAIRE CERTIFICATION)**
**EXHIBIT B**

**JESUP & LAMONT, INC.**
**INVESTOR QUESTIONNAIRE**
**(ALL INFORMATION WILL BE TREATED CONFIDENTIALLY)**

To:     Jesup & Lamont, Inc.

This Investor Questionnaire ("Questionnaire") must be completed by each potential investor in connection with the offer and sale of the shares of common stock and warrants of Jesup & Lamont, Inc. (the "Securities"). The Securities are being offered and sold by Jesup & Lamont, Inc. (the "Company") without registration under the Securities Act of 1933, as amended (the "Act"), and the securities laws of certain states, in reliance on the exemptions contained in Section 4(2) of the Act and on Regulation D promulgated there under and in reliance on similar exemptions under applicable state laws. The Company must determine that a potential investor meets certain suitability requirements before offering or selling Securities to such investor. The purpose of this Questionnaire is to assure the Company that each investor will meet the applicable suitability requirements. The information supplied by you will be used in determining whether you meet such criteria, and reliance upon the private offering exemptions from registration is based in part on the information herein supplied.

This Questionnaire does not constitute an offer to sell or a solicitation of an offer to buy any security. Your answers will be kept strictly confidential. However, by signing this Questionnaire, you will be authorizing the Company to provide a completed copy of this Questionnaire to such parties as the Company deems appropriate in order to ensure that the offer and sale of the Securities will not result in a violation of the Act or the securities laws of any state and that you otherwise satisfy the suitability standards applicable to purchasers of the Securities. All potential investors must answer all applicable questions and complete, date and sign this Questionnaire. Please print or type your responses and attach additional sheets of paper if necessary to complete your answers to any item.

A.     BACKGROUND INFORMATION

Name: _____

Address of Principal Residence (or Principal Place of Business if investor is an entity):

_____
(Number and Street)

_____
(City)                    (State)                    (Zip Code)

Telephone Number: _____

If an individual:
Age: _____     Citizenship: _____

If a corporation, partnership, limited liability company, trust or other entity:
Type of entity: _____
State of formation: _____     Date of formation: _____

Social Security or Taxpayer Identification No. _____

B.   STATUS AS ACCREDITED INVESTOR

The undersigned is an "accredited investor" as such term is defined in Regulation D under the Act, and at the time of the offer and sale of the Securities the undersigned falls and will fall within one or more of the following categories (<u>Please initial one or more, as applicable</u>): [1]

A.   Individual investors:

1._____ I certify that I am an accredited investor because I have had individual income (exclusive of any income earned by my spouse) of more than two hundred thousand dollars ($200,000) in each of the most recent two years and I reasonably expect to have an individual income in excess of two hundred thousand dollars ($200,000) for the current year.

2._____ I certify that I am an accredited investor because I have had joint income with my spouse in excess of three hundred thousand dollars ($300,000) in each of the most recent two years and reasonably expect to have joint income with my spouse in excess of three hundred thousand dollars ($300,000) for the current year.

3._____ I certify that I am an accredited investor because I have an individual net worth, or my spouse and I have a joint net worth, in excess of one million dollars ($1,000,000).

4._____ I am a director or executive officer of Jesup & Lamont, Inc. or its subsidiaries.

5._____ I have individual net worth or my spouse and I have joint net worth of over five million dollars ($5,000,000).

B.   Partnerships, corporations, trusts or other entities:   The undersigned hereby certifies that it is an accredited investor because it is:

1.\_\_\_\_\_ an employee benefit plan whose total assets exceed five million dollars ($5,000,000);

2.\_\_\_\_\_ an employee benefit plan whose investments decisions are made by a plan fiduciary which is either a bank, savings and loan association or an insurance company (as defined in Section 3(a) of the Securities Act) or an investment adviser registered as such under the Investment Advisers Act of 1940;

3.\_\_\_\_\_ a self-directed employee benefit plan, including an Individual Retirement Account, with investment decisions made solely by persons that are accredited investors;

---

[1] As used in this Questionnaire, the term "net worth" means the excess of total assets over total liabilities. In computing net worth for the purpose of subsection (4), the principal residence of the investor must be valued at cost, including cost of improvements, or at recently appraised value by an institutional lender making a secured loan, net of encumbrances. In determining income, the investor should add to the investor's adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, contributions to an IRA or KEOGH retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

4. _____ an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, not formed for the specific purpose of acquiring the Offered Interests, with total assets in excess of five million dollars ($5,000,000);

5. _____ a corporation, partnership, limited liability company, limited liability partnership, other entity or similar business trust, not formed for the specific purpose of acquiring the Offered Interests, with total assets excess of five million dollars ($5,000,000);

6. _____ a trust, not formed for the specific purpose of acquiring the Offered Interests, with total assets exceed five million dollars ($5,000,000), whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in the Offered Interests; or

7. _____ an entity (including a revocable grantor trust but other than a conventional trust) in which each of the equity owners qualifies as an accredited investor.

IN WITNESS WHEREOF, the undersigned has executed this Questionnaire this _____ day of _____, 2008, and declares under oath that it is truthful and correct.

_____
Print Name

By: _____

Signature

Title: _____
(required for any purchaser that is a corporation, partnership, limited liability company, trust or other entity)

## EXHIBIT C (RISK FACTORS)

**FUTURE ACTION BY FINRA REGARDING ANY FUTURE PURPORTED VIOLATIONS OF THE NET CAPITAL RULE COULD RESULT IN FURTHER SHUTDOWNS OF OUR SECURITIES BUSINESS AND COULD HAVE A MATERIAL ADVERSE EFFECT ON OUR BUSINESS AS A WHOLE**

On April 9, 2008, FINRA notified our broker-dealer subsidiary, Empire Financial Group ("EFG") that FINRA believed that EFG was out of compliance with the SEC's Net Capital Rule 15c3-1 as of April 3, 2008. Accordingly, FINRA ordered EFG to cease conducting a securities business, other than liquidating transactions, while purportedly remaining out of compliance with FINRA's interpretation. Although the issue was resolved within six days so that EFG was able to resume full operations of conducting its securities business on April 15, 2008, the temporary cessation of EFG's operations has caused harm to Jesup & Lamont, Inc. as a whole ("JLI") that cannot be quantified at this time. We cannot assure you that FINRA may not in the future allege similar violations of the Net Capital Rule or seek to shut down our broker-dealer subsidiaries' securities business again. If another shutdown were to occur, it could have a material adverse effect on our ability to conduct JLI's business in the future.

**THE EXISTENCE AND TERMS OF OUTSTANDING OPTIONS, WARRANTS, CONVERTIBLE PREFERRED STOCK, STOCK SUBSCRIBED AND CONVERTIBLE DEBT IMPAIRS OUR ABILITY TO RAISE CAPITAL THROUGH SUBSEQUENT DEBT OR EQUITY OFFERINGS AND COULD IMPAIR OUR ABILITY TO OBTAIN ANY FINANCING ON FAVORABLE TERMS.**

The existence and the terms of outstanding options, warrants, convertible preferred stock, stock subscribed and convertible debt may adversely affect the terms at which we could obtain capital through additional equity financings. In addition, the terms of our convertible debt impose restrictions on our ability to obtain capital through debt financing. The holders of the options, warrants and convertible preferred stock have the opportunity to profit from a rise in the value or market price of our common stock and to exercise or convert them at a time when we could obtain equity capital on more favorable terms than those contained in these securities. The existence of these securities impairs our ability to raise capital through subsequent equity and debt offerings.

**FAILURE OF OUR SECURITIES BROKERAGE SUBSIDIARIES TO MAINTAIN REQUIRED MINIMUM NET CAPITAL MAY SUBJECT THEM TO FINES, PENALTIES AND OTHER SANCTIONS INCLUDING SUSPENSION OR EXPULSION AS BROKER-DEALERS.**

Our securities brokerage subsidiaries, EFG and Jesup & Lamont Securities Corporation ("JLSC"), are subject to SEC Uniform Net Capital Rule 15c3-1, which requires the maintenance of minimum net capital and requires that the ratio of aggregate indebtedness to net capital, both as defined, shall not exceed 15 to 1. Net capital and the related ratio of aggregate indebtedness to net capital, as defined, may fluctuate on a daily basis.

Failure to maintain the required net capital may subject EFG and/or JLSC to suspension or revocation of registration by the SEC and suspension or expulsion by FINRA and other regulatory bodies and ultimately could require EFG's and/or JLSC's liquidation. The Net Capital Rule prohibits payments of dividends, redemption of stock, the prepayment of subordinated indebtedness and the making of any unsecured advance or loan to a shareholder, employee or affiliate, if the payment would reduce the Firm's net capital below a certain level.

At December 31, 2007, EFG reported net capital of $812,456, which was $320,956 above the required net capital of $491,500. At December 31, 2007, JLSC reported net capital of $745,509, which was $645,509 above the required net capital of $100,000.

## FAILURE TO MAINTAIN AMERICAN STOCK EXCHANGE LISTING

We cannot assure you that we will be able to continue to satisfy the requirements necessary to remain listed on the American Stock Exchange ("AMEX") or that the Amex will change its rules or that the AMEX will not take additional actions to delist our common stock. If for any reason, our stock were to be delisted from the AMEX, we may not be able to list our common stock on another national exchange or market. If our common stock is not listed on a national exchange or market, the trading market for our common stock may become illiquid. Upon any such delisting, our common stock could become subject to the penny stock rules of the SEC, which generally are applicable to equity securities with a price of less than $5.00 per share, other than securities registered on certain national securities exchanges provided that current price and volume information with respect to transactions in such securities is provided by the exchange or system. The penny stock rules require a broker-dealer, before a transaction in a penny stock not otherwise exempt from the rules, to deliver a standardized risk disclosure document prepared by the SEC that provides information about penny stocks and the nature and level of risks in the penny stock market. The broker-dealer also must provide the customer with bid and ask quotations for the penny stock, the compensation of the broker-dealer and its salesperson in the transaction and monthly account statements showing the market value of each penny stock held in the customer's account. In addition, the penny stock rules require that, before a transaction in a penny stock that is not otherwise exempt from such rules, the broker-dealer must make a special written determination that the penny stock is a suitable investment for the purchaser and receive the purchaser's written agreement to the transaction. As a result of these requirements, if our common stock were to become subject to the penny stock rules, it is likely that the price of our common stock would decline and that our stockholders would find it more difficult to sell their shares.

## FAILURE TO SUCCESSFULLY TRANSITION THE LONG ISLAND OFFICE

In March 2007, we acquired the independent office in Long Island. Due to the uncertainty of several factors such as the ability to retain the brokers, market conditions and regulatory factors, there is no assurance that the intangible assets recorded under purchase accounting will not be written down in the future as impaired assets.

## WE ARE AT COMPETITIVE DISADVANTAGES TO A NUMBER OF COMPANIES.

Our competitors generally have greater marketing, financial and technical resources than ours. These competitors can offer a wider range of services and financial products than we can. Our competitors also have greater name recognition and more extensive client bases. These competitors may be able to respond more quickly to new or changing opportunities, technologies and client requirements and may be able to undertake more extensive promotional activities, offer more attractive terms to clients and adopt more aggressive pricing policies. Moreover, current and potential competitors have established or may establish cooperative relationships among themselves or with third parties or may consolidate to enhance their services and products. We expect that new competitors or alliances among competitors will emerge and may acquire significant market share. We cannot operate successfully, and may not be able to continue to operate, unless we overcome these competitive disadvantages.

## CONTROL OF OUR COMPANY BY A SINGLE SHAREHOLDER LIMITS THE POWER OF OTHER SHAREHOLDERS TO INFLUENCE DECISIONS.

EFH Partners and its individual members beneficially own approximately 21% of our outstanding common stock and approximately 19% of our outstanding and subscribed common stock. As a result of their stock ownership EFH Partners can elect all of our directors and approve or disapprove all matters requiring stockholder approval, such as selling substantially all of our assets, merging with another entity or changing our Certificate of Incorporation. EFH Partners' controlling position effectively limits the voting power of other stockholders. Further, the Chairman of our Board of Directors is also co-managing director of EFH Partners further increasing EFH Partners' influence over our business and affairs.

## THE OCCURRENCE OF LOSSES NOT REFLECTED ON OUR STATEMENT OF FINANCIAL CONDITION COULD REDUCE OUR OPERATING RESULTS AND IMPAIR OUR LIQUIDITY WITHOUT ADEQUATE PRIOR NOTICE TO INVESTORS.

Retail customer transactions are cleared through the clearing brokers on a fully disclosed basis. In the event that customers default in payments of funds or delivery of securities, the clearing brokers may charge the Company for any loss incurred in satisfying the customer's obligations. Additional credit risk occurs if the clearing brokers of affiliates do not fulfill their obligations. Though we regularly monitor the activity in our customer accounts for compliance with margin requirements, rapid change in market value or lack of liquidity for securities held in margin accounts could impose losses on us. In addition, we have sold securities which we do not currently own and therefore will be obligated to purchase the securities at a future date. We have recorded these obligations in our financial statements at June 30, 2008 at the market values of the securities and will incur a loss if the market value increases subsequent to June 30, 2008. The occurrence of these off balance sheet losses could impair our liquidity and force us to reduce or curtail operations.

## CONCENTRATIONS OF CREDIT RISK INCREASE THE RISK OF MATERIAL HARM FROM DEFAULTS.

We are engaged in various trading and brokerage activities in which counterparties primarily include broker-dealers, banks and other financial institutions. In the event counterparties do no fulfill their obligations, we may be exposed to risk. The risk of default

depends on the creditworthiness of the counterparty or issuer of the instrument. It is our policy to review, as necessary, the credit standing of each counter-party. Our cash in bank accounts, at times, exceeds the Federal Deposit Insurance Corporation ("FDIC") insurable limit of $100,000. We have not experienced any previous losses due to this policy. The concentration of these credit risks increases the magnitude of the harm we would suffer in the event of default.

## POTENTIAL LOSSES OR SANCTION AS A RESULT OF EMPLOYEE MISCONDUCT

Employee misconduct could result in regulatory sanctions and unanticipated costs to us. Because our business involves handling cash and marketable securities on behalf of our customers, employee misconduct could result in unknown and unmanaged risks or losses. Misconduct by employees could also include binding us to transactions that exceed authorized limits or present unacceptable risks or unauthorized or unsuccessful activities. If these losses are significant they could materially reduce our income and impair our liquidity.

## MARKET PRICE FLUCTUATIONS COULD RESULT IN LOST REVENUES TO US AND ADVERSELY AFFECT OUR PROFITABILITY.

Our order execution services involve the purchase and sale of securities predominantly as principal, instead of buying and selling securities as an agent for our customers. As a result, we may own securities or may be required to buy or sell securities to complete customer transactions. During the period that we own the securities or may be required to buy or sell securities, market prices could fluctuate significantly which could result in lost revenues to us and adversely affect our profitability.

## TERMINATION OF BUSINESS RELAIONSHIPS BY OUR NETWORK OF INDEPENDENT REGISTERED REPRESENTATIVES

Our independent registered representatives could terminate their relationship with us on little or no notice and could associate with another broker-dealer. The independent registered representatives can transfer their client accounts which could adversely affect our revenues.

## OUR ADMINISTRATIVE COSTS, INCLUDING COMPLIANCE WITH SECTION 404 OF THE SARBANES-OXLEY ACT, WILL BE SIGNIFICANTLY HIGHER THAN THEY ARE NOW, WHICH WILL MAKE IT MORE DIFFICULT FOR US TO BE PROFITABLE AND EFFECT OUR CASH FLOW. DIFFICULTIES IN COMPLYING WITH SECTION 404 OF THE SARBANES-OXLEY ACT COULD AFFECT OUR MARKET VALUE.

The Sarbanes-Oxley Act of 2002, as well as new rules subsequently implemented by the Securities and Exchange Commission and the American Stock Exchange have imposed various new requirements on public companies, including requiring changes in corporate governance practices. Our management and other personnel will need to devote a substantial amount of time to these compliance requirements. Moreover, these rules and regulations increase our legal and financial compliance costs and make some activities more time-consuming and costly.

In particular, the Sarbanes-Oxley Act requires, among other things, that we maintain effective internal control over financial reporting and disclosure controls and procedures. We are

required to perform system and process evaluation and testing of our internal control over financial reporting to allow management to report on the effectiveness of our internal control over financing reporting, as required by Section 404 of the Sarbanes-Oxley Act. Beginning in 2009, our independent registered public accounting firm will be required to evaluate and test our internal control over financial reporting, and to issue an opinion on the effectiveness of our internal control over financial reporting. Our testing, or the subsequent testing by our independent registered public accounting firm, may reveal deficiencies in our internal control over financial reporting that are deemed to be material weaknesses. Our compliance with Section 404 will require that we incur substantial accounting expense and expend significant management time on compliance-related issues. We currently do not have an internal audit group, and we will evaluate the need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our independent registered public accounting firm identifies deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock could decline and we could be subject to sanctions or investigations by the Securities and Exchange Commission, the American Stock Exchange or other regulatory authorities, which would require additional financial and management resources. In addition, if we are unable to meet filing deadlines for reports required by the Securities Exchange Act, our securities could be delisted from the American Stock Exchange. If our securities were delisted, trading, if any, in our securities would be conducted in the over the counter market on FINRA's "OTC Bulletin Board." Consequently, the liquidity of our securities could be impaired.

FUTURE SALES OR THE POTENTIAL FOR SALE OF A SUBSTANTIAL NUMBER OF SHARES OF OUR COMMON STOCK COULD CAUSE THE TRADING PRICE OF OUR COMMON STOCK TO DECLINE.

Sales of a substantial number of shares of our common stock in the public markets, or the perception that these sales may occur, could cause the market price of our stock to decline and could materially impair our ability to raise capital through the sale of additional equity securities. We had 13,087,210 shares of common stock issued and 12,563,092 outstanding at June 30, 2008 and an additional 28,341,855 shares of common stock underlying options, warrants, convertible securities, and common stock and warrants subscribed. The exercise or conversion of these securities and the sale of the underlying shares could depress the price of our common stock.

WE MAY ISSUE SHARES OF PREFERRED STOCK IN THE FUTURE, WHICH COULD DEPRESS THE PRICE OF OUR STOCK.

Our corporate charter authorizes us to issue shares of "blank check" preferred stock. Our Board of Directors has the authority to fix and determine the relative rights and preferences of preferred shares, as well as the authority to issue such shares, without further shareholder approval.

WE MAY EXPERIENCE SIGNIFICANT FLUCTUATIONS IN OUR QUARTERLY OPERATING RESULTS DUE TO THE NATURE OF OUR BUSINESS AND THEREFORE MAY FAIL TO MEET PROFITABILITY EXPECTATIONS.

Our revenue and operating results may fluctuate from quarter to quarter and from year to year due to a combination of factors, including fluctuating gains and losses in our trading income, turnover in our brokers, and the level of investment banking transactions completed by us and the level of fees we receive from those transactions. Accordingly, our operating results may fluctuate significantly in any particular quarter or year.

## WE MAY INCUR SIGNIFICANT LOSSES FROM TRADING AND INVESTMENT ACTIVITIES DUE TO MARKET FLUCTUATIONS AND VOLATILITY.

We may maintain trading and investment positions in the equity markets. To the extent that we own securities, i.e., long positions, a downturn in those markets could result in losses from a decline in the value of those long positions. Conversely, to the extent that we have sold securities that we do not own, i.e., short positions, an upturn in those markets could expose us to potentially unlimited losses as we attempt to cover our short positions by acquiring assets in a rising market.

We may from time to time have a trading strategy consisting of holding a long position in one security and a short position in another security from which we expect to earn revenues based on changes in the relative value of the two securities. If, however, the relative value of the two securities changes in a direction or manner that we did not anticipate or against which we are not hedged, we might realize a loss in those paired positions. In addition, we maintain trading positions that can be adversely affected by the level of volatility in the financial markets, i.e., the degree to which trading prices fluctuate over a particular period, in a particular market, regardless of market levels.

## OUR BUSINESS COULD BE ADVERSELY AFFECTED BY A DOWNTURN IN THE FINANCIAL MARKETS.

As a securities broker-dealer, our business is materially affected by conditions in the financial markets and economic conditions generally, both in the United States and elsewhere around the world. Many factors or events could lead to a downturn in the financial markets including war, terrorism, natural catastrophes and other types of disasters. These types of events could cause people to begin to lose confidence in the financial markets and their ability to function effectively. If the financial markets are unable to effectively prepare for these types of events and ease public concern over their ability to function, our revenues are likely to decline and our operations will be adversely affected.

## OUR REVENUES MAY DECLINE IN ADVERSE MARKET OR ECONOMIC CONDITIONS.

Our investment banking revenues, in the form of financial advisory and underwriting fees, are directly related to the number and size of the transactions in which we participate and therefore may be adversely affected by any downturn in the securities markets. Additionally, downturn in market conditions may lead to a decline in the volume of transactions that we execute for our customers and, therefore, to a decline in the revenues we would otherwise receive from commissions and spreads. Should these adverse financial and economic conditions

appear and persist for any extended period of time, we will incur a further decline in transactions and revenues that we receive from commissions and spreads.

### WE DEPEND ON OUR SENIOR EMPLOYEES AND THE LOSS OF THEIR SERVICES COULD HARM OUR BUSINESS.

Our success is dependent in large part upon the services of several of our senior executives and employees. We do not maintain and do not intend to obtain key man insurance on the life of any executive or employee. If our senior executives or employees terminate their employment with us and we are unable to find suitable replacements in relatively short periods of time, our operations may be materially and adversely affected.

### OUR RISK MANAGEMENT POLICIES AND PROCEDURES MAY LEAVE US EXPOSED TO UNIDENTIFIED RISKS OR AN UNANTICIPATED LEVEL OF RISK.

The policies and procedures we employ to identify, monitor and manage risks may not be fully effective. Some methods of risk management are based on the use of observed historical market behavior. As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate. Other risk management methods depend on evaluation of information regarding markets, clients or other matters that are publicly available or otherwise accessible by us. This information may not be accurate, complete, up-to-date or properly evaluated. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to properly record and verify a large number of transactions and events. We cannot assure you that our policies and procedures will effectively and accurately record and verify this information.

We seek to monitor and control our risk exposure through a variety of separate but complementary financial, credit, operational and legal reporting systems. We believe that we effectively evaluate and manage the market, credit and other risks to which we are exposed. Nonetheless, the effectiveness of our ability to manage risk exposure can never be completely or accurately predicted or fully assured. For example, unexpectedly large or rapid movements or disruptions in one or more markets or other unforeseen developments can have a material adverse effect on our results of operations and financial condition. The consequences of these developments can include losses due to adverse changes in inventory values, decreases in the liquidity of trading positions, higher volatility in earnings, increases in our credit risk to customers as well as to third parties and increases in general systemic risk.

### CREDIT RISK EXPOSES US TO LOSSES CAUSED BY FINANCIAL OR OTHER PROBLEMS EXPERIENCED BY THIRD PARTIES.

We are exposed to the risk that third parties that owe us money, securities or other assets will not perform their obligations. These parties include:

- o  trading counterparties;

- o  customers;

o  clearing agents;

o  exchanges;

o  clearing houses; and

o  other financial intermediaries as well as issuers whose securities
   we hold.

These parties may default on their obligations owed to us due to
bankruptcy, lack of liquidity, operational failure or other reasons. This risk
may arise, for example, from:

o  holding securities of third parties;

o  executing securities trades that fail to settle at the required time
   due to non-delivery by the counterparty or systems failure by
   clearing agents, exchanges, clearing houses or other financial
   intermediaries; and

o  extending credit to clients through bridge or margin loans or other
   arrangements.

Significant failures by third parties to perform their obligations owed
to us could adversely affect our revenues and perhaps our ability to borrow in
the credit markets.

## INTENSE COMPETITION FROM EXISTING AND NEW ENTITIES MAY ADVERSELY AFFECT OUR REVENUES AND PROFITABILITY.

The securities industry is rapidly evolving, intensely competitive and has few barriers to
entry. We expect competition to continue and intensify in the future. Many of our competitors
have significantly greater financial, technical, marketing and other resources than we do. Some
of our competitors also offer a wider range of services and financial products than we do and
have greater name recognition and a larger client base. These competitors may be able to respond
more quickly to new or changing opportunities, technologies and client requirements. They may
also be able to undertake more extensive promotional activities, offer more attractive terms to
clients, and adopt more aggressive pricing policies. We may not be able to compete effectively
with current or future competitors and competitive pressures faced by us may harm our
business.

# EXHIBIT B

**Antoine Aysseh**
250 East 54ᵗʰ Street
Apt #34B
New York, NY  10022-4816

October 1, 2008

Mr. Steven Rabinovici
Jesup & Lamont, Inc.
650 Fifth Avenue
New York, NY  10019

**Re: Antoine Aysseh JLI Subscription Agreement**

Dear Steve:

Please debit my Jesup & Lamont account #1245-1614 in the amount of $125,000 to fund my purchase of shares and warrants as agreed in my JLI Subscription Agreement dated October 3, 2008.

Sincerely,

Antoine Aysseh

# EXHIBIT C



# Jesup & Lamont
*Established 1877*

**ANTOINE AYSSEH**

OCTOBER 1 - OCTOBER 31, 2008
ACCOUNT NUMBER: 1245-1614

Page 5

## Stocks and Options

### Stocks continued

| DESCRIPTION | QUANTITY | ADJ PRICE/ ORIG PRICE | ADJ COST/ ORIG COST | CURRENT PRICE | CURRENT MARKET VALUE | UNREALIZED GAIN/LOSS | ESTIMATED ANNUAL INCOME | ANNUAL YIELD (%) |
|---|---|---|---|---|---|---|---|---|
| US BANCORP NEW | | | | | | | | |
| USB | | | | | | | | |
| Acquired 01/29/08 | 500 | 33.69 | 16,890.70 | 29.8100 | 14,905.00 | - 1,985.70 | | |
| Acquired 01/30/08 | 500 | 33.51 | 16,800.70 | 29.8100 | 14,905.00 | - 1,895.70 | | |
| Total | 1,000 | | $33,691.40 | 29.8100 | $29,810.00 | - $3,881.40 | 1,700.00 | 5.7 |
| ZIX CORP | | | | | | | | |
| ZIXI - HELD IN MARGIN | | | | | | | | |
| Acquired 04/13/04 | 5,000 | 17.15 | 86,292.50 | 1.7900 | 8,950.00 | - 77,342.50 | | |
| Acquired 05/04/04 | 5,000 | 13.74 | 68,903.00 | 1.7900 | 8,950.00 | - 59,953.00 | | |
| Total | 10,000 | | $155,195.50 | 1.7900 | $17,900.00 | - $137,295.50 | N/A | N/A |
| **Total Stocks** | | | **$300,112.42** | | **$154,115.00** | **- $191,630.38** | **$7,140.00** | |
| **Total Stocks and Options** | | | **$300,112.42** | | **$154,115.00** | **- $191,630.38** | **$7,140.00** | |

## Cost information for one or more securities is not available. If you have cost information and would like to see it on future statements, contact Your Account Executive.

## Activity detail

| DATE | ACCOUNT TYPE | TRANSACTION | QUANTITY | DESCRIPTION | PRICE | AMOUNT | CASH AND SWEEP BALANCES |
|---|---|---|---|---|---|---|---|
| 10/01 | | | | BEGINNING BALANCE | | | 28,028.46 |
| 10/02 | Cash | DEPOSIT | | FUNDS RECD | | 105,000.00 | 133,028.46 |
| 10/10 | Cash | WIRE TRANSFER | | WIRE TO FIFTH THIRD BAN 1010EJB7505C001634 | | - 125,000.00 | 8,003.46 |
| 10/10 | Cash | CHARGE | | WIRE FEE | | - 25.00 | 8,003.46 |
| 10/13 | Cash | SALE | - 3,572.00000 | CITY LOAN INC | 0.0500 | 161.84 | |
| 10/13 | Margin | SALE | - 600.00000 | MOTOROLA INCORPORATED | 5.2136 | 3,086.39 | |
| 10/13 | Margin | SALE | - 250.00000 | PLUG POWER INC. | 0.8901 | 205.77 | |
| 10/15 | Cash | DIVIDEND | | US BANCORP NEW 101508 1,000 | | 425.00 | 11,457.46 |